## CIRCUIT COURT OF THE CITY OF ROANOKE

Sonja K. Jones

v.

Wayne E. Withrow

January 10, 1985

Case No. (Juvenile Appeal) 301

By JUDGE JACK B. COULTER

### I. PRELIMINARY STATEMENT

Sonja K. Jones, the mother of Crystal Gwen Jones, now age six, filed a civil Petition for Support in the Juvenile and Domestic Relations District Court of the City of Roanoke on April 17, 1984. She charged that Wayne E. Withrow, with whom she had never married, was Crystal's father and requested support from him. She was seeking a court order that the defendant be required to submit to a "medically reliable genetic blood grouping test" which had been added to Sec. 20-61.1 by the General Assembly in 1982 as the fifth subject permitted of ". . . other evidence that the man is the father of the child."

The defendant, by his attorney, filed a Plea of Res Judicata claiming that "the Petitioner alleges the Defendant is biologically the father of said child and consequently liable for child support pursuant to Va. Code Sec. 20-61.1." The petition, however, was filed on Form DC-610 approved by the Supreme Court of Vir-

ginia for civil petitions. On this pre-printed form, Va. Code Secs. 16.1-241(A)(3) and 16.1-279(F) are referred to as the applicable statutes involved. Form DC-612X is the criminal non-support petition generated by Va. Code Sec. 20-61.

The defendant further asserted in his plea that the same petitioner had filed an identical petition on December 3, 1980, in the same court for support of the same child against the same defendant and that said petition had been "dismissed" on January 13, 1981, with the notation "Paternity not proven . . ." The petition of April 17, 1984, was heard on June 6, 1984, and the plea of res judicata was sustained.

The decision of the Juvenile and Domestic Relations District Court was duly appealed and no evidentiary hearing on appeal was initially sought. This Court, however, after appointing Attorney Mark Tolland to serve as guardian ad litem for the subject infant, requested briefs on the law which have been submitted. During oral argument on November 13, 1984, the Court directed that Sonja Jones's original petition of December 3, 1980, and the standard forms for criminal support cases be made a part of the record as Court Exhibits 1 and 2.

## II. THE ISSUES

Shorn of the various technical arguments advanced and countered, the basic issue is whether or not the determination of January 13, 1981, which duly adjudicated that Wayne E. Withrow had not been proven to be the father of the child Crystal, precludes a second effort. Does the doctrine of double jeopardy, in other words, or its civil counterpart the rule of res judicata, foreclose any additional hearing on the subject of Sonja Jones's petition of April 17, 1984? Does the adding of the infant in her own right through the appointment of a guardian ad litem, when she was not a party to the first hearing, remove the bar of res judicata? Can the new law represented by the recent amendment to Sec. 20-61.1 be applied retroactively so as to affect, adversely to the defendant, the prior determination that he was not Crystal's father?

## III. THE ARGUMENTS PRO AND CON

### A. THIS IS A CIVIL PROCEEDING AND THE PETITIONER HAS STANDING TO APPEAL

The defendant's major premise is grounded on the proposition that the issue of paternity is a criminal proceeding. In support of that contention, he argues that Sec. 20-61 provides in pertinent part that ". . . any parent who . . . willfully neglects or refuses or fails to provide for the support and maintenance of his or her child under the age of 18 years . . ." shall be guilty of a misdemeanor . . ."; that Sec. 20-61.1 requires proof of paternity (if not otherwise voluntarily admitted in court or in writing under oath) "beyond a reasonable doubt", which is, of course, the criminal standard;[1] that Sec. 20-68 gives the right of appeal only to the person accused and that, if not strictly speaking a criminal proceeding under Chapter 5 of Title 20, nonetheless Sec. 16.1-296, under Chapter 11 of Title 16.1, requires "an appeal . . . taken by any person on a charge of nonsupport" to follow the procedure for appeals in prosecutions under Sec. 20-61, et seq., hence limiting appeals only to accused persons.

The resolution of the first point raised by the defendant, then, to the effect that this Court has no jurisdiction because Sec. 20-68 limits the right of appeal to the accused, turns on the defendant's primary contention that this is a criminal proceeding. His further arguments that the doctrine of double jeopardy and the prohibition against ex post facto laws apply likewise hang on whether or not we are, as the English say, "doing crime."

Clearly, however, the petitions filed by Sonja Jones, both on December 3, 1980, and April 17, 1984, were civil petitions. They were submitted on forms approved by our Supreme Court expressly designating them "civil" and expressly referring to Section

---

[1]See, however, Va. Code Sec. 64.1-5.1 2b and Sec. 64.1-5.2 which sets a "clear and convincing evidence" test in establishing paternity under the Laws of Descent and Distribution.

16.1-241(A)(3) and Sec. 16.1-279(F) as the applicable statutes. The orders entered in both instances were similarly on such forms expressly designating them "civil." The option to file a criminal nonsupport petition or to use a criminal nonsupport order on pre-printed forms designated for such purpose was readily available (Court Exhibits 1 and 2). The very style of these proceedings (Sonja K. Jones v. Wayne E. Withrow) demonstrates that it is a civil matter; the Commonwealth is not a party and the Commonwealth Attorney has not participated. Furthermore, fathering an illegitimate child, as well as mothering one, is not in and of itself a crime (although fornication, a necessary antecedent, still is. See Sec. 18.2-344). Criminal sanctions may come into play only after a father is ordered to contribute to the support of his child, after his paternity has first been established, and he has thereafter refused to comply with such order.

An Attorney General's Opinion of March 23, 1973, concludes that "An action under Sec. 20-61.1 of the Code is not a criminal or penal law . . ." This opinion, of course, is not binding authority on this Court and the precise determination is probably wrong. (See *Distefano* v. *Commonwealth*, 201 Va. 23 (1959), and *A Primer on Paternity* by Judge Arlin F. Ruby (1982), 12-15, 65-68, presented to the Judicial Conference of Virginia in April, 1981.) But such opinion contributes to the conclusion that a proceeding under the alternative statutes [Sec. 16.1-241(A)(3)], particularly when it is officially identified as "civil", is *not* criminal. If proceeding under Sec. 20-61.1 may not be criminal, as the Attorney General has concluded, then clearly the "civil" proceeding is not criminal.

Jurisdiction was invoked in the instant case because the matter involved:

A. The custody, visitation, support, control or disposition of a child: . . .
3. Whose custody, visitation or support is a subject of controversy or requires determination.

The "subject of controversy," or the matter "requiring determination." was whether or not the

defendant, Wayne E. Withrow, was the father of Crystal Gwen Jones and thereby legally obligated to contribute to her support. The question of whether or not Withrow was refusing to support his child had not yet been reached; the criminal threshhold had not been crossed; there was as yet no basis to bring a "charge of non-support." Hence the provision in Sec. 16.1-296 that where an appeal is taken on a "charge of nonsupport" the procedure shall be as is provided for appeals in prosecutions under Chapter 5 (Sec. 20-61, et seq.) of Title 20, which allows under Sec. 20-68 only an "accused" to appeal, is not applicable. Furthermore, the provision in Sec. 16.1-296 refers to an appeal taken "by any person"; it is not limited to an accused.

This case is the claim of Sonja K. Jones v. Wayne E. Withrow. It is simply not a criminal proceeding. The original petitioner, therefore, whose second petition to declare Wayne E. Withrow the father of her child, was dismissed in the Juvenile and Domestic Relations District Court, has standing to appeal.

**B. AS THIS IS NOT A CRIMINAL PROCEEDING, THE CRIMINAL DOCTRINES OF DOUBLE JEOPARDY AND THE PROHIBITION AGAINST EX POST FACTO LAWS ARE NOT APPLICABLE.**

Having so ruled, then, that this is not a criminal proceeding, the questions of double jeopardy and the prohibition against ex post facto laws are technically not involved. Both of these sound and sacred doctrines apply to criminal actions. The proscription against double jeopardy is enshrined in the 5th Amendment to the Constitution:

Nor shall any person be subject for the same *offense* to be twice put in jeopardy of life or limb.

Double jeopardy, simply defined, is "A prohibition against a second prosecution after a first trial for the same offense." Black's Law Dictionary 440 (5th Ed. 1979).

An ex post facto law, similarly forbidden by the federal[2] and state[3] constitutions, is defined:

> . . . as a law which provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent; a law which aggravates a crime or makes it greater than when it was committed; a law that changes the punishment or inflicts a greater punishment than the law annexed to the crime when it was committed; a law that changes the rules of evidence and receives less or different testimony than was required at the time of the commission of the offense in order to convict the offender; . . . a law which deprives persons accused of crime of some lawful protection to which they have become entitled, such as the protection of a former conviction or acquittal, . . . every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage. Black's Law Dictionary 520 (5th Ed. 1979).

But as noted in *Commonwealth v. United Cigarette Mach. Co.* 120 Va. 835, 839-840 (1917):

> Ex post facto laws relate to criminal proceedings which inflict punishments or forfeitures and *not to civil proceedings* which affect private rights retrospectively. (Emphasis added).

[2]Article I, Sec. 9, Clause 3, Constitution of the United States.

[3]Article I, Sec. 9, Constitution of Virginia.

## C. THE KEY ISSUES IN THIS CASE ARE WHETHER RES JUDICATA APPLIES AND WHETHER THE RECENT AMENDMENT TO SECTION 20-61.1 MAY BE APPLIED RETROACTIVELY.

Double jeopardy, then, and the consideration of ex post facto laws are limited to crimes or offenses with which we are not here concerned. The related doctrine of res judicata, however, the cousin of double jeopardy, and a respected principle of civil law, is clearly involved. It is, in fact, the key issue of this controversy. Furthermore, the ex post facto principle is given civil application by virtue of Sec. 1-16 of the Virginia Code, wherein it is provided in pertinent part:

> No new law shall be construed to repeal . . . any right accrued, . . . or in any way whatever to affect any such offense or act so committed or done, . . . or any right accrued or claim arising before the new law takes effect . . .

This statute codifies the principle that statutes should generally be given prospective rather than retrospective construction. (Thus, in *Ferguson* v. *Ferguson*, 169 Va. 77 (1937), a will case, a plea of a one year statute of limitations was disallowed as the statute reducing the time from two to one year within which to bring the suit had been enacted after the will had been admitted to probate.) And, in *White's Admx.* v. *Freeman*, 79 Va. 597 (1884), this statute was held to apply to civil cases as well as criminal.

Nonetheless, however, this statute has been held not to apply to mere rules of evidence. As noted in *Virginia & W. Va. Coal Co.* v. *Charles*, 254 F. 379 (4th Cir. 1918) in analyzing this statute:

> "Rights accrued and claims arising under the former law" protected by Section 6 (now Sec. 1-16) from the effect of a repeal, are substantive rights and claims. Rules of evidence are "proceedings", as distinguished from such rights and claims,. . .

And

> We conclude (1) that Section 6 saves from
> the operation of a repealing statute substan-
> tive claims and rights, *but has no applica-*
> *tion to a change by repeal of a mere rule*
> *evidence*, . . . (Emphasis added).

## D. THE PRINCIPLES AND REQUIREMENTS
## OF RES JUDICATA

The principles of res judicata, then, being the main matter at issue, should be carefully reviewed, its concepts defined, and its limitations established. It is defined by Black's Law Dictionary 1174 (5th Ed. 1979) as:

> A matter adjudged; a thing judicially acted
> upon or decided; a thing or matter settled
> by judgment. Rule that a final judgment
> rendered by a court of competent jurisdiction
> on the merits is conclusive as to the rights
> of the parties and their privies and, as to
> them, constitutes an absolute bar to a
> subsequent action involving the same claim,
> demand, or cause of action.

The definition continues:

> And to be applicable, requires identity in
> thing sued for as well as identity of cause
> of action, of persons and parties to action,
> and of quality in persons, for or against
> whom claim is made. The sum and substance of
> the whole rule is that a matter once judi-
> cially decided is finally decided.

Finality of judgment, then, is the reason for the rule; the end of litigation; the prevention of repetitious quarrel; the termination of dispute. (The doctrine is founded upon two maxims of the law, one of which is that "a man should not be twice vexed for the same cause"; the other that "it is for the public good that there be an end to litigation." See 8B M.J., *Former Adjudication or Res Judicata*, 154 (1977).) Jus-

tice Poff's statement of the doctrine in *Bates* v. *Devers*, 214 Va. 667, 670 (1974), is particularly descriptive:

> A judicially created doctrine, res judicata rests upon considerations of public policy which favors certainty in the establishment of legal relations . . . demand an end to litigation and seek to prevent the harassment of parties . . .

In order for res judicata to apply, however, as both attorneys agree, four elements must exist:

1. The former judgment must have been both valid and final;

2. The cause of action asserted in the subsequent litigation must be the same cause of action as was asserted in the former litigation.

3. The former judgment must have been rendered on the merits;

4. The parties to the former judgment must stand in such relationship to the parties to the subsequent action as to entitle the latter to the benefits and subject them to the burdens of the prior litigation.- (*Turpin* v. *Lyle*, 377 F. Supp. 170 (W.D. Va. 1974); *Mowry* v. *City of Virginia Beach*, 198 Va. 205, 211 (1956).)

Thus, the doctrine of res judicata has been defined, its objectives noted, and its limitations drawn. The burden of establishing it as a defense, it being of affirmative character, rests squarely on the party asserting it. (8B M. J., *Former Adjudication or Res Judicata*, Sec. 81 (1977).) He must establish that the causes of action are identical and that the parties are the same, these being the two critical elements at issue here.

## E. AS TO THE APPLICATION OF RES JUDICATA TO THE CASE AT BAR, ARE THE CAUSES OF ACTION THE SAME?

The question of whether the issues provoked by the two petitions of Sonja Jones are identical is not as easy to resolve as might first appear. In both cases, of course, the underlying question was identi-

cal: Is Wayne E. Withrow the father of Crystal Gwen Jones or is he not? At the time of the first hearing, this issue could be resolved only by the man's admission in open court or by his extra judicial admissions, voluntarily given in writing under oath, or by evidence strictly and expressly limited to the following:

(1) That he cohabited openly with the mother during all of the ten months immediately prior to the time the child was born; or

(2) That he gave consent to a physician or other person, not including the mother, charged with the responsibility of securing information for the preparation of a birth record that his name be used as the father of the child upon the birth records of the child; or

(3) That he allowed by a general course of conduct the common use of his surname by the child; or

(4) That he claimed the child as his child on any statement, tax return or other document filed and signed by him with any local, state or federal government or agency thereof. (Va. Code, Sec. 20-61.1)

The dismissal of the first hearing clearly prohibits the introduction of any evidence of paternity that the statute then permitted. Any second effort to prove paternity by any admissions or by considerations of any of the four other factors would not be permitted under the bar of res judicata. But a fifth factor has since been added:

(5) Results of medically reliable genetic blood grouping tests, which test may include the human leukocyte antigen (HLA) test. (Va. Code, Sec. 20-61.1)

This sub-issue has not been litigated. It is new matter. And it is characterized by the sentence which introduces the listing as "evidence." (The second paragraph of Sec. 20-61.1 which precedes the listing of additional factors to consider begins: "Such other *evidence* that the man is father of the child shall be limited to *evidence* of the following:" (Emphasis added).)

In Michie's discussion of the "Identity of Issue", the following observation is made:

> In determining the application of the doctrine of res judicata, if the same facts or evidence would sustain both actions, then

the two actions are considered the same and a judgment in one bars any subsequent action based upon the same facts, *but if different proof is required to sustain the different actions, a judgment in one is no bar to the maintenance of the other.* (Emphasis added) 8B M.J., *Former Adjudication or Res Judicata,* 214 (1977)

Or, as stated in *Alderman v. Chrysler Corp.,* 480 F. Supp. 600, 607 (E.D. Va. 1979):

The "infallible" test of whether a second action involves the same cause of action as a prior suit is whether the facts essential to sustain the two suits are the same.

The second petition to establish paternity in the case at bar is narrowly limited to the "results of medically reliable genetic blood grouping tests," a fact not involved, nor even admissible, and hence clearly not at issue at the first hearing.

The root question here is whether a subsequent change in the law allows a matter once decided to be reopened. Again turning to Michie's, the following general summary is submitted:

The doctrine of res judicata does not prevent a re-examination of the same question between the same parties when, subsequent to the judgment, facts have arisen which may alter the rights of the litigants. 8B M.J., *Former Adjudication or Res Judicata,* 153 (1977).

This notion is thoroughly discussed in 46 Am. Jur. 2d, *Judgments,* Sec. 443, New conditions, facts or evidence, 612-613:

Where a change of fact introduces no new element, and the legal rights and relations of the parties remain as before, the change does not affect the conclusiveness of the prior judgment. Clearly, the enforcement of the rule of res judicata may not be avoided by the discovery of new evidence bearing on

a fact or issue involved in the original action, as distinguished from a subsequent fact or event which creates a new legal situation, even though the newly discovered evidence might have been sufficient to justify a new trial in the first case. *However, where, after the rendition of a judgment, subsequent events occur, creating a new legal situation or altering the legal rights or relations of the litigants, the judgment may thereby be precluded from operation as an estoppel.* In such case, the earlier adjudication is not permitted to bar a new action to vindicate rights subsequently acquired, even if the same property is the subject matter of both actions. *In this connection, it has been declared that the doctrine of res judicata extends only to facts and conditions as they existed at the time the judgment was rendered, and that a judgment is not res judicata as to rights which were not in existence at the time of the rendition of the judgment.* (Emphasis added)

The precise subject of the effect of res judicata on bastardy cases is analyzed in the annotation: *Judgment in bastardy proceeding as conclusive of issues in subsequent bastardy proceeding,* 37 A.L.R. 2d 836 (1954). The general rule is therein suggested to be that a final judgment on the merits in a bastardy hearing is conclusive as between the same parties on the same issues in a later proceeding. The author summarizes:

Few, if any, of the cases contained in this annotation seem opposed to the conclusion that there is nothing in the nature of a bastardy proceeding which necessarily prevents the application therein of the general principle that a final judgment on the merits is conclusive as between the same parties on the same issues in a later proceeding.

Numerous cases are then cited in support of this proposition. But then exceptions, limitations and qualifications to the general rule are explored, chief of which is the case of *Wagner* v. *Baron*, 64 So.2d 267 (Fla. 1953), which provoked the annotation, it also being reported in 37 A.L.R. 2d 831.

In *Wagner*, a judgment had been rendered in 1949 against the putative father in a bastardy proceeding based on a Florida statute enacted in 1828 which called for an award "not exceeding $50 yearly" for the support of a bastard child. The Florida legislature amended this.statute in 1951 to permit greatly increased awards. The mother then instituted a second action under the 1951 statute. On the question of whether or not the first judgment was res judicata, the Florida Supreme Court held that the doctrine of res judicata was inapplicable because the amendment of the statute had resulted in a change of conditions and had created entirely new rights not litigated in the first proceeding. The court observed:

> The cases are legion which hold that res judicata is not a defense in a subsequent action where the law under which the first judgment was obtained is different than that applicable to the second action, or there has been an intervening decision, or a change in the law between the first and second judgment, creating an altered situation.

Further, the court reasoned that the doctrine of res judicata was a rule of convenience to prevent repetitious law suits over matters which have once been decided on issues substantially static. But, quoting from *Imbrici* v. *Madison Avenue Realty Corp.*, 99 NYS 2d 762, 764, the Court noted:

> It (res judicata) is not meant to create vested rights in decisions that have become obsolete or erroneous with time.

The Court concluded:

Clearly, a judgment is not res judicata as to rights which were not in existence and which could not have been litigated at the time the prior judgment was entered.

In analyzing this illusory requirement of the doctrine of res judicata that the issues being litigated must be identical, the theory of after-discovered evidence is not being invoked. That doctrine is limited to previously-existing elements. We are here concerned with an entirely new factor as it might disclose paternity, an element not recognized, not in legal existence, at the time of the prior hearing. This new element, it should also be noted, promises to be far more reliable than all of the other four factors combined, a scientific technique approximating the reliability of fingerprints. The result of any medically reliable genetic blood grouping test was *not* litigated in Sonja Jones's first hearing in 1981; it is the *only* issue that would be determined at the second.

## F. RES JUDICATA CAN BE A BAR ONLY IF THE PARTIES ARE IDENTICAL OR IN BINDING PRIVITY ONE TO THE OTHER

There is, however, a further factor as to the applicability of the doctrine of res judicata. The fourth requirement of the rule is that the parties to the second proceeding be identical, or in binding privity, with the parties to the original litigation. In the case at bar, a guardian ad litem has been added to protect the interests of baby Crystal. There was no guardian for the infant at the first hearing.

It is, of course, obvious that there is a strong and parallel relationship between the mother, who has initiated a civil, non-support petition to determine paternity and the child on whose behalf the petition is principally filed. And it is also true that a guardian ad litem is not an indispensable party to such proceeding; nor is such appointment required in a criminal bastardy proceeding. But the interests of the infant, though similar and overlapping, are not identical. The mother is after financial help; the child is looking for her father. The mother wants money; the

child is seeking identity. She hopes to discover her roots, establish her hereditary and genetic background, learn of her medical risks and prospects, determine her inherited traits of personality. Though clearly similar, the interests are just as clearly not identical. The concerns of the child, though not as yet of age to appreciate nor articulate them, reach above and beyond compelling mere material support from a lover whose heart has grown cold.

Any effort to define privity is difficult at best. Michie concludes:

> There is no generally prevailing definition of privity which can be automatically applied in all cases involving the doctrine of res judicata. Who are privies requires careful examination into the circumstances of each case as it arises. (8B M.J., *Former adjudication or Res Judicata*, 173 (1977).

In tort actions involving the claims of parent and child it is usually considered essential that a guardian ad litem be appointed to represent the separate interests of the child; this is true in most litigation involving infants. They are entitled to their day in court to be represented separately and independently so that nothing can be done to their prejudice, so that no hidden conflicts can be interposed unwittingly to their detriment, so that their individual rights might be fully protected, developed, and independently advanced. Since Crystal Gwen Jones is the ward of the court, her interests should not be foreclosed because of a prior hearing in which she had no independent voice.

In the recent consolidated cases in the *Matter of the Paternity of MDH, RLW & CDM*, 437 N.E.2d 119 (Ind. 1982), res judicata was held not applicable where the first action to establish paternity which was dismissed had been filed in the name of the county welfare department as assignee of the child's rights by the mother, but where the child had not been a party to the action.

Res judicata should not be held a bar to this present action, therefore, at least insofar as it affects the rights of Crystal Gwen Jones, because she

was not a party to the first hearing and she should not be considered in binding privity with her mother's prior claim.

Concluding this issue, then, it is the judgment of this Court that the doctrine of res judicata is not applicable in this case for the reasons as stated:

(1) The parties are not the same, baby Crystal not having been before the Court in the prior hearing nor bound through the claimed privity of her mother; and

(2) There has been a substantial change in the facts and circumstances inasmuch as the law has been amended to permit a more reliable and scientifically accepted test to prove paternity, a fact that was not available, and hence not litigated, at the first hearing.

## G. EVEN IF RES JUDICATA DOES NOT APPLY, HOWEVER, DOES VIRGINIA CODE SECTION 1-16 PRECLUDE THE RETROACTIVE APPLICATION OF A NEW LAW

In addition to his contention that the doctrine of res judicata bars any second hearing to declare Wayne Withrow the father of Crystal Jones, the defendant argues that the general principle under which laws are not given retroactive effect, codified by Va. Code Sec. 1-16, should compel the dismissal of these proceedings. "No new law" this statute begins "shall be construed

(1) to repeal . . . any right accrued or

(2) *in any way whatever* . . . affect any such offense or act so committed or done . . . or any right accrued or claim arising before the new law takes effect . . ." (Emphasis added).

The "new law," of course, is the addition of another subject area of evidence by which fatherhood may be established, the "results of medically reliable genetic blood grouping tests. . ." [Sec. 20-61.1(5)]. Whether this change is the addition of a "mere rule of evidence" and hence more a matter of remedy or whether it is "substantive" and takes away vested rights or imposes a new duty are questions too nebulous and self-contradictory to resolve. The addition of "genetic blood grouping tests" as a means of determining paternity is clearly an evidentiary matter. As heretofore

noted, it is actually so identified in the statute. (Section 20-61.1, paragraph 2, see above) But if applied and given the retroactive effect the petitioner seeks, it just as clearly affects, at least in some way, the act done or the right accrued. We get lost in the maze of semantics if we try to resolve this issue on whether the new law is procedural or substantive. It is a new procedure by which substantive rights are affected.

In any event, however, there is no absolute prohibition of retroactive legislation. It is true that new laws are presumed to be prospective in their operation. (*Paul* v. *Paul*, 214 Va. 651, 653 (1974).) But if the new law does not have the effect of impairing the obligation of a contract or is not destructive of vested rights or is not penal in nature, then such presumption may be overcome by policy considerations of greater magnitude. In the support of children, there are no contractual rights involved; and a father does not have a vested right not to pay for his child's support and maintenance, nor to deny a child the right to determine her identity. Nor is a father being punished in any penal way when the fact that he is a father is legally established. Punishment might come later only when such father defies the responsibilities such determination might impose.

If there has been a right that has accrued to the defendant, perhaps it would be well to identify it. A right is "that which is warranted by moral approval"; or "that to which one has a just claim"; or "any privilege vested in a person by law." (Webster's Collegiate Dictionary 858 (5th Ed. 1940); See also Black's Law Dictionary 1189 (5th Ed. 1979).) If one, in fact, has participated in the act of creating another human being, how does it become a "right" for him to avoid the responsibilities of the consequences of that act of creation? How does it become a "right" to perpetuate a falsehood?

These questions, of course, presuppose and assume that the additional evidentiary test would prove paternity. If it should, then such result would eliminate the contention of the defendant that he has a right that would be affected by the retroactive application of the new law. In other words, we do not truly know whether he has the right he claims he has

until the new law is applied. On this point, however, the defendant would argue that the right that has accrued has been the determination that he is not the father. His right, in other words, is in the determination itself, not in whether the determination was correct, a position not totally consistent with the ascertainment of truth, one of the lofty objectives of the law.

In *Huffman v. Commonwealth*, 210 Va. 530 (1970), our Supreme Court dealt with an analogous situation. In that case a driver's license was revoked under the habitual offender provision of the code. In applying the new law the trial court based its action on a motor vehicle violation that had occurred prior to the passage of the act. The court was thus called upon to take action against a person's privilege to drive an automobile for acts performed prior to the enactment of the habitual offender legislation. Those same acts, when committed, did not carry with them the same consequences as they did subsequent to the legislation. The court held that the prohibition against the enactment of ex post facto laws which are found in both the United States and Virginia Constitutions apply only to criminal offenses. The same principle urged by the defendant in the case at bar, however, was at issue: a new law was construed to repeal a right (the privilege to drive) which was not the law at the time the traffic violations occurred. The new law was given retroactive effect. Is not the determination of one's father of more concern, both public and private, than the temporary loss of one's privilege to drive? If the habitual offender laws can be enforced by the retroactive application of new laws in order to promote safety on the highways, should not new laws as to paternity be given similar application if the welfare of children can be thereby promoted?

## IV. THE PUBLIC POLICY THAT PROMOTES THE WELFARE OF CHILDREN SHOULD PREVAIL OVER THE PUBLIC POLICY THAT SUPPORTS THE DOCTRINE OF RES JUDICATA AND THE PROSPECTIVE APPLICATION OF CIVIL LAWS

In the final analysis a clash of principles has ignited this controversy. Each argument advanced

is supported by sound public policy; one, however, must yield to the other. Res judicata is a judicially developed doctrine based on the appealing and wise policy that there should be an end to litigation, that finality of judgment should be promoted, that repetitious contention should not be tolerated. As noted by Judge Widener in *In Re: Skyline Lumber Company*, 311 F. Supp. 112, 115 (W.D. Va. 1970):

> *The doctrine of res judicata is not based on statute or rule of common law. It is rather a judicial reflection of public policy* favoring one fair trial on the merits by a court of competent jurisdiction as an expedient in the administration of public justice. (Emphasis added).

The following principles extracted from Michie's Jurisprudence illuminate the limitations of the res judicata principle:

> The doctrine of res judicata is a very proper and important principle of law, though technical in nature. Its purpose is to put an end to litigation, *but it is to be applied in the furtherance of justice and not in destruction thereof.* (Emphasis added)

> In the application of the rule of res judicata, *equitable principles should govern,* and it should be so construed as not to deprive litigants of their day in court on an asserted claim, . . . (Emphasis added)

> The doctrine of res judicata is *not rigidly enforced where to do so would finally defeat the ends of justice.* (Emphasis added)

> Where private litigation has extensive implications of public import, *the rule of res judicata or estoppel is not allowed to stultify reassessment of the prior decision.* (Emphasis added)

> The public interest supersedes the private interest. (8B M.J., *Former Adjudication or Res Judicata*, 153-154.)

Further, as noted by Justice Poff in Footnote 2, *Bates v. Devers*, 214 Va. 667, 670 (1974):

> We recognize that in an appropriate case, *res judicata, a doctrine based on public policy, may give way when in irreconcilable conflict with other, more important public policies.* (Emphasis added)

And what public policy is of more importance than the welfare of our children? If public policies against patent monopolies (*Mercoid Corp. v. Mid-Continent Investment Co.*, 320 U.S. 661 (1944).) and supportive of judicial scrutiny and control of the attorney-client relationships (*Spilker v. Hankin*, 188 F.2d 35 (D.C. Cir. 1951).) are examples of concerns that outweigh the rule of res judicata, then how much more should consideration for the best interests of the child tip the scales.

There is no stronger policy in today's society than the welfare of our offspring. The best interests of a child is a paramount and controlling concern in any litigation that impacts on the rights of an infant. Not only is a child the continuing ward of the court, but he is the future of our race. The child must be given top priority and precedence in matters that affect his best interests.

The determination of one's father is of more moment to a child than a mother obtaining financial help from a delinquent father who disputes his fatherhood. The psychological, hereditary and medical impact in learning the identity of one's father are more than matters trivial and emotional. Society -- even beyond imposing financial responsibilities -- also has an interest in fathers' knowing who their children are. And one would think that even the most ignoble of men would have a spark of interest, and perhaps even concern, in knowing in truth whether a child, claiming to be his, is so in fact.

With the advance of modern science and technology, a simple test has been developed that gives an aura of

certainty to the vexatious question of paternity, a truth machine more reliable than the polygraph, for it has the sanction of the state. This new genetic blood grouping test reduces to minutia the previous proofs for parenthood. It should not be ignored simply because it was developed late.

Is the law to be so rigid and inflexible, so fixed and unyielding, that it denies itself the tools of modern science? Is the search for truth and justice to be so inhibited and so shackled that a technique of immeasurable help in that search is to be avoided? Is a baby to be denied her total identity because her mother tried too soon?

The rights of the child in the case at bar, who has not had her independent day in court, will not be subordinated to any claim that all issues have been previously litigated or that a new and superior technique will not be given retroactive effect. Withrow's charge of res judicata or his claim that laws may only be applied prospectively, policy matters of legitimate consideration, must nonetheless fall before the superior concern that the best interests of a child should dominate.

The plea of res judicata is denied. The recent amendment to Sec. 20-61.1 will be given retroactive effect. Granting the petitioner's request, it should be noted, is a two-way street, for it may well prove that Wayne Withrow is not the father of Crystal Jones. The ends of truth and justice will also be the better served if such should be the result, for it will indeed put the matter at rest, once and for all.